Case number 22-1071, Secretary of Labor, Mine Safety and Health Administration, Petitioner v. KC Transport, Inc., and Federal Mine and Health Review Commission. Ms. Maltz for the petitioner, Mr. Dynard for the respondent. Good morning, we'll hear from the secretary. Good morning, may it please the court, I'm Susanna Maltz for the Secretary of Labor. I'd like to reserve two minutes for rebuttal, please. I don't know whether I've effectively done that. Thank you. The court is familiar with this case, so I'll be brief in my opening remarks. The Mine Act covers facilities and equipment used in mining. This court has already recognized this in Donovan v. Carolina State Light. This court can resolve this case on the basis of the facility at issue here alone. This facility was used in mining. I'll turn to the court's first supplemental question. I think there's a problem with you and having us rely on Donovan v. State Light and you relying on Donovan v. State Light because it's a case where the court deferred to the secretary's interpretation and characterized itself as accepting it because it was in within the bounds of reasonableness, I'm paraphrasing. And that's not the way that we do things anymore after local right. So the reasoning may have some independent force, but it would have to have independent force for us to follow that reasoning as opposed to the methodology that the court used to get there. Yes, Your Honor. But we think that if you disagree with that, please explain. The secretary is not asking for deference, but I do agree that the independent reasoning in Donovan v. Carolina State Light is sufficient for this court to rely on now, post-Loeb or Bright, in deciding this case. But, you know, I would characterize the reasoning in Donovan v. Carolina State Light as based on the text of the statute and the use in mining language. And so I do think that that's useful for the court here. So on the issue of whether location has any basis as far as interpreting this subsection, you say no. Not quite. Location is relevant. And the secretary has argued that location can be relevant to, or is relevant to, whether or not something is used in mining. But it need not be dispositive. And so, you know, insofar as the court's supplemental questions get at whether a Subsection C piece of equipment or facility need be located on Subsection A lands or a Subsection B road or at a Subsection C custom coal processing plant, or whether movable items need to be located in a particular place on non-movable items. You know, location is a consideration, but no. The Subsection C items need not be located on those things. So, I have been intrigued by trying to understand the relationship between A, B, and C of the Subsection H. And if you look at B, so A is the area of land basically where extraction occurred. And then B are private ways and roads pertinent to such an area where extraction occurred. And one way of thinking about a pertinent is, well, maybe that means some sort of kind of locational basis or proximity. But usually when discussing land and whether something is pertinent to a piece of land, you look at Black's Law Dictionary and Supreme Court cases about this. It's pertinent if it's kind of necessary to and connected with the use and enjoyment of the land. So, an easement isn't pertinent because you need it to get across the neighboring property to access the roads from your property. Or you need it to access a lake that's a few miles away in your development because one of the amenities of having land in that development is that you can dock your boat at the lake. So, in a pertinent, it might be adjacent, it might be distant way, but the thing that matters is that it's necessary and connected to the use of the land. The reason I think that might be significant is under C where it says used in, to be used in, resulting from. Maybe Congress was getting at the same thing and using those phrases with those verbs in that way so that the location, the tool or equipment isn't a mine just wherever it is, but where it's located at a place that is necessary to the extraction or milling or preparation of minerals. And that place is necessary to and connected with that operation. What do you think about that? I think that that makes sense. I just want to be careful to be clear that the secretary's position is that a movable subsection C item, of course, has a physical location in the world. It's physically excellent, but let me say I agree with that characterization. And I just want to be clear that if there were a piece of equipment not located on a facility, the secretary's position that if it were necessary and connected to mining operation use in mining, then it would be covered under the act. And that's different than, I think, perhaps. Saying that it has to be at a location that or facility that is itself necessary to and connected with the extraction refining preparation. Yeah, and that's not the secretary's argument, though this court could determine that this facility here was covered by the act and not reach that additional question of equipment out in the world. What's your view of. As far as any responses to the other questions that we asked for supplemental. I have several views. I'm happy to speak about. So, if it's useful, I'll focus on the movable subsection C items and whether they need to be located on the non movable items in that list. If that's of interest here. You know, the secretary's argued there's no support for that in the text of the statute statutory language doesn't distinguish between the movable and non movable items. That would violate the rule against surpluses, you know, we must assume that Congress included that entire list of items deliberately. The secretary's also not aware of any case law interpreting that section that way. And that you rely on the used in mining limitation to kind of rationalize What could be viewed as a kind of limitless jurisdiction. And so I'm interested in how you interpret used in mining, but have to be presently used in mining and predominantly used in mining or how do you interpret that. Sure. Um, so as the secretary has Argued perhaps frustratingly to this court, used in mining is very, very fact intensive. So, you know, there's a broad guidelines for that. Some considerations have emerged from the case law location is quite relevant and here in this particular case location is quite relevant. This facility was located 1000 feet from the subsection B road. You know, it's only accessible through a private security gate. These are considerations that would speak to its use in mining. The thing is, if you just tell us used in mining is in fact intensive and it's what we say it is difficult for me to Accept. But if you tell me used in mining is it's presently and predominantly used in mining and then we look at the facts to see if that's true. That gives me a standard to apply. But if you say it's whatever we say it is and it's fact intensive and that is not a good standard. I apologize. I don't mean to imply that there are considerations in the secretary's initial opening brief in November 2022 We speak about the sort of present nature of use in mining. It doesn't, you know, it doesn't mean that once an item is used in mining it's perpetually used in mining. So there's, there is a present Presently and more than 50% use mining. Well, I would be reluctant to ascribe a percentage to it, but Would it have to be at least 50%? I don't know that I can answer that. I think that it would be, you know, I think Then you get the hypotheticals that like, oh, we used it once in mining or we use it once a year in mining and now it's in the parking lot of a diner. Can you inspect that? Right. So if you say it's predominantly and presently used in mining, then I think it goes a little bit more towards limiting your jurisdiction. Yes. So some case law speaks to, you know, sort of a de minimis use in mining wouldn't be use in mining. So let me back up and just say, you know, it's fact intensive, but there are these considerations location, like a de minimis consideration The function and then there is the interagency agreement between NAMSHA and OSHA that sort of lays out specific You know, that sort of allots specific types of things to either agency. So those, that, those considerations are You know, some of what would be useful in making that fact intensive decision. Your friends on the other side point out that there are criminal provisions. In the Mine Act, I think they're at Section 813. No, 820 rather. For willful violations. And if the test is just some sort of amorphous Standardless fact intensive test. They say that that raises, you know, due process type problems. And so we can't have that. So what's your, what's your response to that? So 820 imposes criminal penalties on manufacturers who misrepresent Equipment as permissible for use in mines. That has nothing to do with civil enforcement. That's a provision of the Act that's enforced by the Department of Justice. But, you know, just to address sort of the broader concept of whether or not operators have sufficient notice. The Secretary has been, you know, enforcing this This has been the Secretary's approach for decades. You know, Donovan v. Carolina State demonstrates that. So operators do have notice. I hope that's, I hope I've answered your question. Notice of what? I mean, if An operator, if a person drives A truck that's used in excavation To the local diner and parks it in the parking lot and has, you know, brunch. And there's some sort of a violation that is observed at that location. How do they have notice or not as to whether or not they have Willfully violated a mandatory health or safety stamp. That's the language in 820D. You know, I'm reluctant to engage with that type of hypothetical in that, you know, KC Transport has cited no instance of this type of enforcement in diner parking lots. I don't care whether it's happened or not. I mean, your job, respectfully, is to answer our hypotheticals. I understand. Whether you're concerned about it doesn't matter to the court. I'm concerned about it. That ought to matter to you. Of course. I'm sorry. Can you repeat the question. So how do you deal with the kind of due process notice vagueness concerns. Of your proposed standard for figuring out whether something is a Why, why, why should we not have any such concerns and the answer can't be just trust us. Well, the statute does lay out this used in mining language. And so, you know, in so far as the operator can like speak with them show about whether something, you know, operators can engage with and communicate with them show for use in mining. Isn't the notice that you're on notice that you are liable for any violations that might occur in your equipment that's used. And so they don't need to have specific notice of where they're going to be inspected because I think I read in Carolina state like you don't get notice of when inspections happening because That's part of the process like it can happen at any time. Yeah. The notice is really about the violation and not where the inspection might occur, isn't it. Yes, that's fair. I am, you know, I anticipate that this answer won't be entirely satisfying to the court, but to the extent that entered did cite something at a diner parking lot, you know, the operator could challenge it in court. That's I recognize that that's not a totally responsive answer. But, you know, the statute says what it says. And, you know, it means equipment used in mining. So, But why is it absurd to If you see a blatant violation in a diner parking lot of a pressure dredger or auger something that's definitely used in mining. Is it so absurd to cite the The operator in a diner parking lot. Well, you know, I think my colleagues would have a lot to say about that. My colleagues on the other side. Given that You know, I think the mine act obviously has a health and safety. Hope that is absurd. No, I don't necessarily think that's absurd, but I do understand concerns about a totally limitless well shouldn't say totally limitless because we certainly don't concede that it's totally limitless, but I do understand concerns about these very, very fringe extreme hypothetical Circumstances, but no, I would not call it absurd. And I What are the geographic Well, the limits are used in mining. And so, you know, if something imagine I understand. I am. I apologize. I don't mean to Speak over your being non responsive. The if a truck were quite close that would probably, you know, speak to its use in mining more than if it were 5000 miles away, but I and I understand that this is not The most useful answer, but there's not a specific geographic limit. It would be a fact intensive inquiry. And it's conceivable that A piece of equipment 5000 miles away would be Mine, it would be quite on you. I just, it would be very strange and bad business practice. I think if Casey transport had a, you know, first while 5000 But let's Let's say that I Was a contractor for a mining company and they had me use my, my hammer and chisel every day. I do it five days a week. I've done it. I've done it for five years. And I, I take a weekend trip to Alaska. I fly there 5000 miles away from the mine. Take my hammer and chisel with me. I'll be check baggage. Carrying it on and I'm going to bring it back the next week and keep using it every day of the week. Keep using the project. So with that hammer and chisel while it's in Alaska. Judge Walker. I cannot say I understand that that's not satisfying. But, you know, it would be a, I think that would be quite unusual. What would it take to make it not a mine. If it were not used in mining. I just told you that was used every day in line. So mine. Well, I don't know that it's used in mining when it's in Alaska. I think, you know, that was, it's not I apologize for speaking over you, but It's used every day in A Virginia month. And I take it for the weekend to Alaska. I'm not using it while I'm on vacation Alaska, but I'm going to use it the next Monday when I come back to the Virginia month. And in this hypothetical issue is inspecting the pickaxe in Alaska. I think that's a very, that's, you know, I should say, I don't think that that's a realistic outcome, but I do understand my role is to respond to these hypotheticals. So The natural implication of your argument. Yes, the pickaxe is a mine, but we probably wouldn't We wouldn't inspect it in Alaska, but yes, we could. That's the natural implication of your position. I don't agree that that's that You know, that that's entirely the natural outcome because location is relevant. With your position that the literal reading of the statute controls and the pickaxe is not a mine. Well, if the pickaxe is in Alaska on a Sunday afternoon. It's, you know, the considerations about the location far from the mine and about, you know, the use of that pickaxe at that moment, which, you know, So you think location does matter because the fact that it's in Alaska. We think that location is relevant to the question of whether or not it's used in mining. It's just not this far. It's used in mining all the time. It just happens to be in Alaska for the weekend. I understand, but is it used in mining at that moment? And I should say, No, I should say that, you know, this isn't the Secretary's opening brief, but it's not a hyper literal interpretation of a present tense. So it seems, you know, possible that it is used in mining, but again, I understood your brief to be saying location doesn't matter if it's used in mining. It matters only in deciding whether it's used in mining or not. But the ultimate question is, is it used in mining? And the natural implication of your position is under Judge Walker's hypothetical pickaxe is a mine. We probably or we wouldn't realistically inspect it in Alaska, but we could. But I thought that's the natural implication of your argument. And also your whole argument about dredges, augers, pushers is they're not on extraction sites or processing plants, but they are used in mining. No matter where they are, you can inspect them. They could be in Alaska and you can inspect them. You can inspect them wherever they are because you put them on roads that are not near extraction or processing sites and they're still mines. That was my understanding of your brief. So I think that's a fair understanding, although I should say, you know, the Secretary isn't arguing that location has no relevance at all, just that it's not dispositive. And, you know, the dredger, the dredges, excuse me, can't take a dredge on an airplane. So it doesn't fit into that hypothetical. But the point is, it doesn't matter where it is. Your position is it doesn't matter where it is. If it's used in mining, then it's a mine. That's your position. I think there's a it's not that it doesn't matter where it is. It's just that, you know, even when it is not on land from which minerals are extracted or on a road or on another non-movable sea item, even when it's not on those, it's still used in mining. I recognize that that's very close, but I do think that there's a distinction between location not mattering at all and location not requiring a dredge to be in any of those particular places in order for EMSHA to inspect it. I think the other thing to consider when we're trying to figure out what used in mining or to be used or resulting from the work, what that means in subsection C is that if you compare H2 to H1 to H2, in 802 H2 is the definition of coal mine. And that had been, you know, the definition that was in existence long before these 1977 amendments that added this new definition that we are struggling with. But the coal mine definition talks about an area of the land and all structures, facilities, machinery, tools, et cetera, placed upon, under, or above the surface of such land. So it links the tools, equipment, et cetera, to the land directly by saying it has to be placed upon, under, or above the surface. For whatever reason, Congress in its wisdom didn't write H1 that way. And so you have subsection A, this area of land where minerals are extracted. But unless we have C, we wouldn't even be able to know for sure that tools, equipment that are being used in the mining right at the extraction site would be considered mines. There'd be an argument that only the land is the mine, but the tools aren't because you didn't say anything about that in A. The same, it's not written the way that, you know, H2 is written. So that's some of the work that subpart C does. It makes sure that equipment, machines, and tools that are at the extraction site or at a preparation site or a milling site, that those are considered mines as well and can be inspected. Is that correct? No, I disagree with that, with that interpretation. You know, A, subsection A lands, if MSHA had jurisdiction over the land itself, but not anything on it, that would, you know, that would defy common sense and be purpose-defeating because then MSHA couldn't inspect, you know, a continuous mining machine or a longwall mining machine, just the earth around it. And that's simply not how, you know, subsection A has played out. Then there's, of course, the lands on land issue. Whether it played out and whether forks in the past have interpreted it that way, I kind of don't care about. I can't speak for the other members of the panel. But we're supposed to, at this point, just look anew at the text and give it, give our best shot at the best interpretation. And so when I look, when I read the text and I compare H2 to H1, there's that obvious difference in how they're drafted. And to get to all of the equipment on the land where extraction is happening, that's some of the work that C does. But you're saying, no, C isn't doing that work at all. That's right. And then why does it even say used in or to be used in or resulting from the work of extracting such minerals if tools and equipment and machinery from extraction were already covered in A? Well, tools and machinery, et cetera, from extraction are covered in A when they are on those lands where minerals are extracted. But in C, they're covered when they are used in mining. So there's a distinction there. So when Congress says a coal or other mine is an area of land, they mean an area of land and any bulldozer sitting on it. Yes, because land can't bulldoze itself, which I think Congress recognized. And Congress has instructed that the definition be given the broadest possible effect, which I think would tend to support an argument. They said that in legislative history. They didn't say that anywhere. Yes. Yes, that's correct. I should say just very briefly, H2 deals with entitlement to black lung benefits, and it doesn't have to do with the scope of Ensha's enforcement authority. So, you know, I recognize why it's relevant to sort of compare the two, but it's just not terribly relevant to what H1 is driving at and the purpose of H1, which is to define the scope of Ensha's enforcement authority and of Ensha's inspection authority, et cetera. I do have a list of questions, and I beg for your patience and my colleagues' patience as well. I want to nail down the Alaska hypothetical to start with. It sounds like I gave the hypothetical, you said maybe it would be a mine, maybe it wouldn't be. What facts would it take to make it not a mine? You know, I think if you took it to Alaska and it were lost in the vast tundra and... That's not the hypothetical. I understand. I apologize, but I don't think I can give you sort of a satisfying set of facts because there isn't a multi-factor test. But there are these considerations. My facts. I used every day in mine into Alaska for the weekend. I'm going to bring it back to use it every day in mine afterwards. I have it with me the whole time. You can think of no facts that would make it not a mine other than facts that are inconsistent with my hypothetical. Is that correct? I suppose that's correct, you know, accepting that premise. But facts inconsistent with the hypothetical, I just, you know, there's a whole universe of potential facts that could make it not a mine. That are consistent with my hypothetical? I wouldn't be able to articulate them for you. I just can't articulate a multi-factor test or something like that. That's just not, you know, what the case law. One more hypothetical, and I think I'm done with hypotheticals. Same guy uses the pickaxe every day in the mine for years on the weekdays. He's going to continue to. He brings it home, puts it in his garage. Actually, even better. He just puts it in his living room every night. Is it a mine overnight in his living room? You know, I can't say. What facts would it take to make it not a mine? I understand that this is a frustrating answer, but I cannot, you know, put forward facts about that particular hypothetical item's use in mining. I think happily. I think that's a good answer to my question, which is that you cannot think of any fact in the universe that would make the hammer in his living room not a mine. I don't, I wouldn't characterize it that way, no. Well, if you can think of a fact, why can't you name the fact? I, it's, I, I don't quite know how to answer that either, but I just can't put forward, you know, various facts in these hypothetical. Let me ask the question that Judge Wilkins asked in the previous oral argument. He said, you may not know the answer to this, but I guess it's a practical matter. Does MSHA have some sort of regulatory process whereby it requires mining companies to give it an inventory, so to speak, of all their various facilities that might fall within the definition? And you didn't know at the time. Do you know now? So, there is a regulation. This is not quite responsive to that precise question, but I think it's helpful. There's a regulation that requires operators to, to inform MSHA when they begin mining, when they temporarily pause mining or permanently pause mining. They must communicate that to MSHA. So, you know, I think that captures some of what that question was driving at. Does the notification include an inventory? Well, the notification would be about, you know, the, you know, the land or the subsequency item, hypothetically. You know, if there were a portable crusher that the operator of that crusher would speak with MSHA about when it and where it's mining. So, not an inventory per se, but it would communicate about that. That communication would involve some information about these items. But, to my knowledge, I don't know that there's, you know, a list that operators provide. I appreciate that. The Sixth Circuit seems like it's, I think last time you were here, you said the Sixth Circuit's in conflict with where the DC Circuit was, at least pre-Loper. And Sixth Circuit would be in conflict with where you want the DC Circuit to go. Correct? Yes. And, you know, I should say, I apologize. You can remember that thought. I'll write it down. Please. The Fourth, Seventh, and Eighth Circuits. Would you want us to be consistent? Where are they in this? We have argued that, you know, where they've considered subsection C, they have, you know, determined, as this court has, that, you know, I shouldn't say that. Where they've considered H3H1, they are consistent with the Secretary's interpretation. So, if we do what you promised to do here, there would be a 4-1 circuit split. The Sixth Circuit on one side, DC, Fourth, Seventh, Eighth on the other side. I would disagree with the Fourth, Seventh, and Eighth sort of, their decisions are, you know, sort of speaking to the same issue. So, I would characterize the split as between the Sixth and DC Circuit, not, you know, not involving those other circuits. But I guess what I mean is the sort of premises, the sort of broad reasoning employed by those circuits is not inconsistent with Donovan v. Carolina Staley. And it is inconsistent with the Sixth? Well, the Sixth, I mean, insofar as the Sixth sort of speaks to this specific issue, you know, I wouldn't say that it has a relationship with the Sixth Circuit's finding in Maxim necessarily. But if those courts were to be faced with this type of, you know, inquiry about Subsection C, then their prior findings would ideally inform an outcome that is consistent with the Secretary's approach. So, let me ask, if you have a case in the Fourth, Seventh, and Eighth Circuits, and it's the exact issue that you have in this case, would you say in your brief, your precedents suggest you should rule for our position? Yes. But I wouldn't say your precedents already create a circuit split with the Sixth Circuit, you know, necessarily. Or I just wouldn't say that. I'll stop, I should say. I think this was maybe Judge Wilkins' first question of the day, and it sounded like you were kind of agreeing with the theory that he laid out. And I think that's all, but I'm not sure. I'm just going to read from this order of supplemental briefing that we gave you, and you tell me if you agree. The statute's – it's a crazy question. I'm going to say the statement and then ask if you agree. Okay. The statute's definition of mod applies to movable objects in H1C only when they are located in or at a physical manifestation enumerated in the same list, and that physical location is used in or to be used in or resulting from the work of mod. Is that statement correct? No. Do you want to say why or do you feel like your brief already said? I feel like your brief said why. You don't have to read it. That's sort of your call to action. Okay. This is my last question. Thank you for letting me go through that. Of course. I mentioned this in the footnote in my original dissent, but it's like two sides of the V, two briefs filed. One of them is filed by the Department of Labor. That is an executive branch agency, correct? Yes. And then one of them is filed at least on behalf of – on the other side of the V is KC Transport and the Federal Mine Safety and Health Review Commission. The Federal Mine Safety and Health Review Commission. Is that in the executive branch? I believe it – well, I actually – I'm so sorry. I don't know. I should know the answer to that, but don't. But they're – insofar as they're not participating in this case, they're not – they're the underlying judicial body. They're the body that produced what would be equivalent to the district court decision in a classical federal court approach. If they're not in the executive branch, what branch would they be? Well, the reason that I hesitate is because I think it's possible that it's judicial, but I actually – I'm sorry. I'm almost certain that it's an executive branch agency. It's also – it's an agency that's not invested with policymaking authority. So, you know, it's – insofar as these questions are sort of driving at Loper-Bright. Yeah. That means you have two executive branch agencies on either side of the V. Have you talked to the current Department of Justice about whether they think an intra-executive branch dispute is justiciable in a federal court? No, I have not. And I just – to be clear, the review commission is essentially the trial body. So, you know, when they produce a decision that the secretary disagrees with, the secretary is empowered to appeal that decision to the courts of appeals. So, you know, it's a judicial body, and I understand what your question is driving at, but – But you don't know the current Department of Justice's position? I do not know the Justice Department's position on that, but it would be, I think – Can you find out? Theoretically, yes. I mean, yes, I could potentially find out, but I just – again, I don't mean to repeat myself, but just to emphasize, it would be – it would sort of defeat the purpose of the commission as an adjudicatory body if, you know, the secretary was – you know, these are separate – they're just – they're simply separate, independent of one another. And, you know, I'm not aware of any law that would require a coherence in that way. I just wonder if the new head of civil division or the new attorney general thinks the law that would – the law that you're looking for would be Article 2 or Article 3. I understand the question. I don't – as far as I'm aware, nothing has changed in this case, you know, since it was filed. I have no more questions, and I'm grateful again to you for your patience and to my colleagues. I just want to go back to Judge Walker's hypotheticals about his pickaxe in Alaska, et cetera, and I'm just wondering why you're so resistant to just saying, yeah, that's mine. I'm not empowered to, you know, just to – I think – You're not empowered? You can't state the government's – No, I apologize. – in an oral argument where that's kind of a central question? That's not the framework I should have used, but – so I do apologize. The fact-intensive nature of use in mining just sort of is incompatible with assessing that type of hypothetical without, you know – But he gave you the facts. I understand, and – It seems to me that the natural, I guess, implications of your brief and your position is like, yes, that's mine. And I don't know why that's a problem, because the used-in mining limitation makes sure that things are not completely absurd, and while we could inspect that pickaxe in Alaska, we wouldn't. I just don't know why it's such a problem for you just to accept the natural implications of your own position in your brief. I don't. Because his hypothetical talks about pickaxes, but your brief talks about dredges. Same idea. If it's used in mining, I thought your position was, you know, the location does inform whether it's used in mining or not, but if it is used in mining, if it's located in Alaska or Hawaii or anywhere, we have a broad mandate to make sure it's safe for mining. And it should be presently and predominantly used in mining, you know, to rationalize this. But if so, we want to make it safe. Like, why isn't that your position? I don't understand. I agree with that characterization. I just, with respect to the hypothetical pickaxe, I, you know, I feel like the facts of that hypothetical – Each, you know, the dredge would be, I think, considered used in mining based on the relevant facts of that dredge. But the relevant facts of the pickaxe are just like a dredge, the way Judge Walker gave it to you, and I just don't understand why you can't say, yes, the pickaxe is a mine. I appreciate your position, and I appreciate the point of the question, but I should say that, you know, it's not that MSHA has jurisdiction over every dredge in any circumstance. The dredges are also subject to use in mining. Are they ever not used in mining? I thought you said they were portable mines. Well, they are not used in mining. There are certain types. So, there are essentially two types of dredging. One to remove – I think it was the pusher. The pusher, you said. It's a portable mine. So, there's the portable crusher, portable screeners. You know, these things are – Regardless of the details. Yes. A piece of machinery that is used only in mining. That's all it does. It's a portable mine. If it is used in mining, yes. Its location actually doesn't matter. Correct? Well, its location might be relevant to determining if it's used in mining, but its location is not – They can't be used in anything but mining. If it's used in mining, then it's covered by the Act. And it could be in Alaska. It could be in Hawaii. It could be anywhere that MSHA has, I guess, geographical jurisdiction. Right. MSHA's – Yes? I – So, sorry. I don't mean to interrupt. I think I was reacting to the wrong thing. MSHA's empowered –  If it is used in mining, MSHA has jurisdiction to enforce the Act with respect to that item. So, that means it can, of course, add to the PIC Act as well. If the PIC Act is used in mining. Thank you. Thank you. There was one more point that I wanted to make about Donovan, if that's – if I may. Yeah. If you can make that point, and then we'll give you some time on your phone. Sure. I just – very briefly. You know, Donovan was – Donovan, I think, was quite recently after the Chevron decision. I apologize. I don't have the date right in front of me. But, you know, I just – I do want to revisit your question about whether or not I agree that the court's reasoning there was really based in a deferential posture. And, you know, my read of Donovan v. Carolina Stalight is that it's not terribly reliant on that deference. And, again, the Secretary's not asking for deference. So, the reasoning in Donovan, by my read, is about the use in mining language. And the court can follow that same reasoning here. Thank you. While we hear from AC Transfer. Thank you. Good morning. Good morning, Your Honors, and may it please the court. Adi Dainar for KC Transport, Inc. I would like to start with the – attempting to answer many of the questions that my friend on the other side received. Judge Wilkins, the plain text of the Mine Act, prohibits MSHA from asserting jurisdiction over trucks or truck repair shops that are not at locations where extraction, milling, or preparation takes place at the time the violation occurs. And that is the best reading of Subsection C as well as Section H2. What in the text tells us that? What? It has to be located at a location where extraction occurs, when it doesn't use – could have said – used the same language it's in H2, but it didn't. So, I would point to the way that Subsection H1a, b, and c are structured. So, 1a talks about an area of land where extraction occurs, and that is tied directly to Subsection C, which says areas of land and, you know, facilities, tools, equipment, etc., used in three specific activities. So, I think location remains – I'm sorry, where in C are you getting areas of land? I'm sorry, Your Honor. In Subsection C, there is – the list of things like shafts and passageways are all connected to the location, the mine itself. So, it is very integral to the mining. And equipment, machines, and tools are not, which is also in C. Which is where I was going, right. And the equipment, machines, tools, equipment is used in or to be used in three different and specific things – extraction, milling, and preparation. So, the best reading of Subsection C is driven by location, and then the activity being performed is confirmatory as to the location. But it can be used in without being on the land where the extraction occurs. That's the crux of the issue here. Well, so we disagree that just the use in mining analysis, you know, is the best reading of the statute. But that language is in the statute, used in mining. Yes, but then, you know, the plain text of that statute does say used in mining, but it's not used in mining, it's used in extraction. And the facility, the truck repair shop, is not used in extraction. It doesn't say used in extraction, it says used in mining. I'm trying to understand your textual argument. I know you have other arguments, but textually, I don't see it. I don't see the words of the statute saying what you're saying the words say. Well, beyond that, Subsection C says used in the work of extraction. Where does it say that? I'm looking at it right now. In Subsection C, it says used in or to be used in or resulting from the work of extracting. Okay. So it's not just mining, you know, without definition, it's used in extraction. That's the first activity that the Subsection C lists. The second activity is milling, which is not defined in the statute. The third activity is preparation plants, which is defined in Subsection 802 or 802 Subsection I. So those activities are relevant to the analysis. So do you read A to be an area of land where minerals are extracted, but not to cover equipment and tools on the land? And then you read C to cover the equipment and tools on the land? Correct. When they are at those locations. So the location, again, remains... Right, right. I'm just trying to understand the relationship between A and C under your reading. Because the Secretary says A is an area of land where extraction occurs in anything that's on it. I'm saying A is just the land, but C is the equipment that's on it. Correct. And Congress chose to define it that way for several reasons, because Congress wanted to contain MSHA's inspection obligation a certain way. And that Fine Act reading is also necessary, Judge Walker, to implement all of the other provisions of the Mine Act, because otherwise those other provisions start looking like surplusage. I'm sorry. I thought I read that the amendment that brought us C was to address things that were not at the extraction site, like dams. Isn't that why they added this? Because they wanted to cover things that were not at the extraction site. Well, I think that's exactly right, because Congress wanted to ensure that it's not just the land and the shafts and the passageways themselves, but all of the equipment that is actually used in the creation of those shafts and in the creation of removing ore from the side of the mountain are covered by the Mine Act. Well, that answer isn't really responsive to Judge Pan's question, because the very first item in C is lands. Right. So if A is an area of land from which minerals are extracted, then why do they need to put lands in C? It could be other lands, right, where minerals aren't extracted. Why else would Congress have used lands as the very first word in subsection C, unless it meant some other land where extraction isn't occurring under your reading of how A and C work together? I grant you it's repetitive. Subsection A and C does repeat the word lands, but I think that shows Congress's intent to make sure that all of the machinery and equipment that is on that land where extraction, milling, or preparation takes place is covered and under MSHA jurisdiction. So the cases that I would point you to— But when is land in Part C land that would be a mine that is—but it is land where extraction is not happening? So— Or milling or preparation is not happening? So there are certain tailing ponds where some of the sludge from the mining activity is stored or collected before it is released into, say, a river over which the Environmental Protection Agency would have jurisdiction. So there are pieces of land that are connected or at the mine site that collect all of the refuse and all of the sludge. Precisely, and that's what they're getting at with excavations as well. Excavations are pieces of land. It's not just that they're talking about. My point is that your textual argument kind of falls apart if lands and excavations aren't located, you know, where extraction is occurring. Does it not? It does not fall apart, and I was trying to point to some cases that might shed some light on this. So if you look at Maxim itself, it is talking of a repair shop that is at least more than one mile from the place where extraction, milling, or preparation takes place. And the Sixth Circuit had no trouble in concluding that that repair shop is not a location where extraction, milling, or preparation takes place, and therefore MSHA lacks jurisdiction over it. Now the reality is… You just told me that a land where there might be a retention pond is a mine even though no extraction, milling, or preparation takes place there. If it is connected and adjacent to the actual mine site, because otherwise… Where is it connected or adjacent in the text? Well, again, Maxim talks about this concept of adjacency, and that's, I think, where you started, Your Honor, which is this concept of appurtenance is no different than the concept of adjacency that Maxim talks about. Appurtenance is something that is integral to the mining activity itself, and that appurtenance is important, and Maxim has taken that concept into account. So, yeah, appurtenant, you know, lacks law definition of appurtenant. You know, one of them, the one that seems most relevant to me, is necessarily connected with the use and enjoyment of whatever it's appurtenant to. So, why then isn't a tool or piece of equipment a mine when it's located at a site that is necessarily connected with the use and enjoyment or operation of an extraction site or a milling site or a preparation site? So, Your Honor, I think… So, we are saying all of those tools and equipment when they are at locations where extraction, milling, and preparation takes place. MSHA has jurisdiction over those tools and equipment, and MSHA has jurisdiction over the generic repair work that happens at those mine sites. But if repair work is happening several miles, several thousand feet, you know, 500 miles, 5,000 miles in Alaska, MSHA does not have jurisdiction over any of that, and the reality is… But MSHA has jurisdiction over an appurtenant road, right? Yes. The road is not where milling or extraction or preparation takes place. It's necessary and connected with that. And that is independently—the jurisdiction is independent of subsection C because subsection B covers it? Yes. What I'm saying is that Congress seemed to want MSHA to have jurisdiction at locations, not just where the extraction, milling, preparation takes place. One way we know that is because they added B. And why is it one way we know that is because they added C, and they used words like used in or to be used in or resulting from, and that sounds a whole lot like kind of the test of when we know something is appurtenant to something else. It's like its usage is kind of necessarily connected with the land. So, that's—I guess what I'm trying to get you to explain to me is how looking at this text, why isn't it natural for us to construe the text in C to include areas outside of where the extraction takes place, so long as it's an area that's necessary and kind of connected with the extraction process? Because a host of other federal, state, and local agencies have jurisdiction over those things that are not at locations where mining activity occurs. So, EPA is involved in some tailing ponds because that refuse or those minerals or whatever is in the water is getting released into the environment. But I understand Judge Wilkinson's question to be about the text of the statute, and you started out by talking about the text of the statute. So, I'm still not understanding why the text of the statute supports your argument. Why wouldn't Congress have just said lands, et cetera, on extraction sites as opposed to used in the work of extracting if it was the way you think it should be? Well, Judge Pan, Congress chose the words it chose to write, Section 802, and to the extent that there is any sort of frustration with those—with the way the words are written, it would be a policy decision that after a law proprietor is left to Congress, it's not left to the agency, it's not left to the courts. So, I'm trying to say that the text does not extend to give MSHA this open-ended, we-know-it-when-we-see-it use in mining. Well, I don't understand that. I'm trying to understand why. I'm trying to understand your textual argument. Well, the textual—if you look at the actual phrase in subsections, the used in or to be used in. So, let's take to be used in, for example. MSHA does not have jurisdiction over manufacturing of equipment. They've admitted in their supplemental brief, it's in Section 820 of the Mine Act as well. So, to be used in, if that were read in isolation, the context of the act and the text of the act simply does not extend MSHA's jurisdiction to everything that can be used in mining activity. Now, you're just like ignoring all the conversation that we had about a pertinent. I mean, you could read to be used in, resulting from, used in, and similar to a pertinent to say that if it's at a location, what those words mean is that it's at a location that is necessarily connected with the use and operation of extraction, et cetera, et cetera, than it is used in or to be used in or resulting from. And so, we don't have some amorphous, standardless, you know, definition that no one has due process, fair notice of. That's what those words mean. Why isn't that what those words mean? Just looking at the text in the whole provision as a whole, because we're supposed to look at context, all of those things that Loeber, Bright, and other statutory interpretation cases tell us that we're supposed to. So, as we briefed in our supplemental filings, the ordinary meaning canon does carry weight, and it carries more weight maybe in an act like the Mine Act because it is written for a quintessential blue-collar worker who has to figure this thing out in the middle of the trenches. And location does remain central, and everything else in the Mine Act is tied to that location. Now, we aren't saying location is the only factor. There's the location plus approach. As your Honor knows, we briefed that question in front of the Supreme Court as well. So, under the location plus approach, the activity, because there are three activities listed in subsection C, those do matter, and that's the contextual clue in the text of the act itself that tells you that the location where these three activities occur, MSHA does have jurisdiction over those locations. How do we know where, if something is to be used in mining, how do we know where that location is? We do not need to know where that location is because MSHA does not have jurisdiction over it. Manufacturing is not covered by the Mine Act. It's covered by other federal agencies' jurisdiction. It doesn't have to be manufacturing. I mean, if I used the dump truck in mining today, and then I park it at a storage facility somewhere outside of the excavation site, and I'm going, it will be used for mining tomorrow. That's not manufacturing. So, where that dump truck is sitting overnight, we have to figure out whether that's a mine or not. And it's to be used in mining within a few hours. It's not manufacturing. So, you can't just, like, build a straw man to tear down and say, you know, construction is absurd. Well, so, that parking lot is not a mine, that truck is not a mine, under our interpretation. And that finite reading is necessary because otherwise, the Secretary is arguing that all of these support services are included. But if support services are included, then every gas station, electric utility company, home depot, Lowe's, a chapel, restaurant, movie theater, all of them become mines. I say this hyperbole respectfully, but if the test is, and I'm going to say it again, if it is locations that are necessarily connected with the use of the mine, and that that's what that means, and we can kind of take that clue from a pertinent, then the dump truck isn't a mine when it's at Home Depot or at the diner or at those other places. But it might be a mine if it's at a storage facility that is operationally a part of or integrated with extraction. So, why isn't that a proper definition of how we define the scope and narrow the scope of what locations can be mines? So, I'm saying adjacency or pertinence, I'm not meaning to say connected to because I think that again is too broad. I'm saying it has to be integral to the mining activities itself. There are three specific mining activities listed in subsection C. That is the best reading of subsection C is my argument. How do you respond to the argument that under your reading of the statute, something that clearly is mining equipment used in a mine, the operator could just move it off site to avoid inspection? So, the law evasion argument, Your Honor, doesn't work in this particular context, and I'll tell you why. Because, you know, if the violation occurs at the mine site, MSHA does have jurisdiction over it. So, this circuit's Otis Elevators case, which then Judge Clarence Thomas wrote, talked about it. The argument is you could just move it off site and then MSHA couldn't inspect it when it's off site, or MSHA could inspect it when it's on site. And when it comes to follow up to make sure that you've made corrections, you could have moved it off site. So, MSHA can't confirm that. And so, there's an argument that it frustrates MSHA's, I guess, regulatory purpose to tie this to the land because they can't effectively guarantee safety under those circumstances. And I guess there are examples in their brief of people actually moving equipment to avoid inspection. So, how do you respond to that? So, MSHA can issue citations if the violation occurs at the mine site. And then, if that piece of equipment is moved, that original citation is still valid. Now, the point of moving the equipment is to fix it, and that abatement concern is valid. But when the equipment comes back to the mine, that's when MSHA has jurisdiction to inspect it. MSHA does not have jurisdiction. But I guess an operator who wanted to avoid inspection could move the equipment off site, either, you know, as a general matter, not keep it on site to avoid inspections. Or once it's been inspected, it could move it off site and not correct the problem. And it would be at least difficult for MSHA to follow up and figure out what's going on. They'd have to wait for the equipment to be brought back to the site for them to have authority to check that equipment. And that doesn't seem to follow from the statutory language. If it's used in mining, it seems that MSHA should be allowed to follow up and make sure that that equipment is safe. So, I would point you to Zeigler Coal, which is a case from the Seventh Circuit that deals with this kind of hypothetical, where the equipment, there was an electrical equipment that was taken to a repair shop for purposes of fixing it. That repair shop was more than one mile from the actual mine site where the equipment functioned. MSHA, the Seventh Circuit said, did not have jurisdiction to go inspect that repair shop. Because that equipment, once it's brought back to the mine site, MSHA has jurisdiction at that point. These are very fact-intensive questions, but do you agree that a facility that is 100% used for mining, that is away from an extraction site, can be inspected to mine? I would disagree that it can be inspected, because that facility is not a place where extraction milling or preparation takes place. But I thought that the test in your brief, and I'm looking at pages 5 and 6, is you're saying that it has to be at a physical location where some activity integral to mining occurs. That's what you think we should, we write this opinion, you think that's what we should write? Yes. What does integral to mining mean? The three activities listed in subsection C. Why didn't you just say that? It's just like we're a dog chasing our tail at this point. Because to be used in the dump truck at the storage lot across the street from the mine is to be used in mining. Or if it's a repair shop across the street from the mine. Why isn't that integral to mining? Because the location has to remain central. Otherwise, MSHA has nationwide, global jurisdiction. No, I'm talking about a location across the street from the extraction site, where dump trucks and all the other equipment is stored and repaired. In your hypothetical, is that location under local jurisdiction? Because local cops do inspect and do see if there is a broken down equipment just sitting in a parking lot. I don't answer my hypothetical. Those are all the facts you know, and you have the text of the statute. Why isn't that facility of mine under the text and even under the test that you propose? You don't say some activity integral to mining occurs, but only if local cops or local OSHA doesn't inspect it. I mean, that wasn't part of the test in the brief, so why is it relevant to answering my hypothetical? Parking a piece of equipment anywhere in the world doesn't give MSHA jurisdiction over that parking lot. And that's the argument I'm making, because that parking lot should be a location where extraction, milling, or preparation takes place. And because those three activities do not take place at that parking lot, even if it is across the street, MSHA does not have jurisdiction. So when you said in your brief, activity integral to mining, you didn't really mean that. You just meant where extraction or milling or preparation takes place. I grant you that was a shorthand we used in the brief, but the text of the statute lists three specific activities, and that is what we meant when we said that has to be integral to mining. And we were answering the first question, which sort of clubs mining into one word where there's three specific activities listed in the statute. So why, then, is a road that's pertinent to an extraction site, why did Congress include that? I mean, I'm assuming that you concede, because it's right there in subsection B, that such a road is a mine under the Act, right? Yes, subsection B is an independent basis for MSHA jurisdiction. So I guess all I'm asking you is why shouldn't we think that C could mean the same thing, that it could mean that there could be locations outside of where extraction, milling, preparation occurs, where MSHA has jurisdiction the same way that they have jurisdiction over roads, even though extraction doesn't necessarily occur on the road? Because Congress did not write subsection C that way. And I want to be clear about the scope of the pertinent road, subsection B. It actually has to be a pertinent road, because the Department of Transportation and local authorities have jurisdiction over all roads. You have to follow traffic laws when you're transporting equipment, for example. And all of the machinery of government that— That argument doesn't seem to me very persuasive, because you would concede that if MSHA doesn't have jurisdiction over any of this stuff, then OSHA does, right? OSHA, EPA, a bunch of other agencies. So we aren't interpreting this to fill a gap. We're interpreting this statute to see where this specific agency should have jurisdiction as opposed to another one. So your whole argument about, well, don't worry, because somebody else regulates that doesn't seem particularly relevant, because that's not really the exercise. We're trying to see what Congress intended for MSHA to have jurisdiction. We know that DOT or OSHA or EPA or someone else might have jurisdiction if MSHA doesn't. I'm sorry, Your Honor, but I was answering this law evasion concern that Judge Pan started with and that my friend on the other side briefed. So that is a concern, but I am here to tell you that that concern is easily addressed by the fact that there is a bunch of regulations that a host of other agencies, federal, state, and local, have that does affect all of these case-in-transport trucks and the repair facility. So there is no law evasion happening the way that my friend would like you to believe. That was the point I was trying to make when I was addressing those questions. Can I get some clarity on, I guess, how you – well, I'll just ask. A piece of equipment that's on an extraction site, that's a mine, right? Well, it's not always a mine. So it is within MSHA's jurisdiction. At the time, the equipment is at a location where extraction milling or preparation takes place. So if it's a piece of equipment on an extraction site, it's within MSHA's jurisdiction. Is that what you just said? Yes, at the time the violation occurs. Okay, and then same thing if it's at a milling site, right? Yes. Same thing if it's at a preparation site. Yes. What if it's on a road pertinent to an extraction site? Then MSHA would have jurisdiction over it. And is that because of B or is that because of C? Because of the pertinent road, the subsection B provision. That's because of B. Yes. And so if there were no C, MSHA would have that jurisdiction over the pertinent road because of B. That's what you just said. And MSHA would have jurisdiction over a piece of equipment on an extraction site because of A. If there is no C, they would have it because of A. I'm not disagreeing. It might sound like I'm being hostile. I'm just trying to figure out. Yes, that's it. Okay. So now I'm confused because I thought you said earlier that A does not cover equipment that's at the extraction site. That's why we have to have C. I was answering the fact that it was repetitive in A and C. So to answer Judge Walker's hypothetical, yes, subsection A covers areas of land where extraction occurs. If the equipment is at an area of land where extraction occurs, then that equipment, MSHA would have jurisdiction over it just by virtue of subsection A if there is no subsection C. So, okay, let's live in a world for a second where Congress wrote the statute and did not include subsection C. Just A and B as they are written. And there is a bulldozer, an auger, or whatever it is at the extraction site. If all we had were A and B and there is no C, is that equipment a mine? Yes, when it is at that site. So why are we interpreting subsection A differently when there is no C than when there is a C? Well, I think because this case comes to you from the Secretary of Labor's appeal and subsection C was put at issue in the review commission and in front of the ALJ of the review commission. So that's why we're looking at subsection C. But I agree with you that subsection A, standing alone without B or C, does answer the question. Whether KC's repair shop is a facility, no, not under subsection A, not under subsection B. Are the trucks themselves mines? No, under subsection A and subsection B. But, I mean, we are trying to do a textual analysis. We're trying to see how to best read the statute. So if there were no C, and the best reading of A is that it's land where there's extraction occurring, but also equipment and machinery and tools that are on that land when extraction occurs. You're saying that would be the best reading of A if there were no C? Yes. So why isn't it still the best reading of A once C is added? And then maybe C does something else. So what C is adding is the milling and preparation. So it's not just extraction. Three different things are happening in subsection C. So extraction is repetitive for subsection A, but then there is milling that is covered and preparation facilities that are covered under subsection C. So that's basically what C is doing. Well, it also, instead of saying used in, it says to be used in or resulting from extraction, right? And that's where I'm trying to say the ordinary meaning and the canons of construction do matter in that circumstance. Because ultimately, you can't read the word mine, which is not defined in the statute, totally out of the statute. And that's what the ordinary meaning canon does. And now after Loper specifically, we have to exhaust the tools of statutory construction. And the ordinary meaning canon is an especially potent tool for constructing or construing subsection C. So it's not just used in or to be used in a vacuum. It's within the context of reality. And that's when I was telling the other agencies do have jurisdiction over trucks and truck repair shops. The point is the use in mining analysis or the know it when we see it analysis doesn't provide any notice or due process to the regulated parties. Like the quintessential hammer in some parking garage in someone's living room becomes a mine. So we have to take into account that ordinary meaning to construe the meaning, the text of subsection C. That was my basic point. Because Congress did not choose to hide all these elephants in the subsection C mousehole. The reality is that MSHA is asking you to procure basically an open-ended self-serving interpretation. That has no limiting principle. I did not hear my friend offer any limiting principle. Well, a retention pond might be an elephant, but I don't think Congress was hiding it in a mousehole when they used the word lands as the first word in C. It's part of the preparation plan. You agree that there can be lands that aren't where extraction occurs, right? So it's a preparation plant and the best case for that actually is Carolina State because it was a processing facility. There can be lands that aren't associated with preparation plants. A lot of these retention ponds and other lands that Congress talked about in the hearings and the reports were lands resulting from extraction. These slurry ponds and other things where water is dammed up and then the dam breaks and it kills a bunch of people or damages a bunch of property. So extraction isn't occurring at those lands. When those lands aren't milling for preparation, they are lands resulting from extraction. Those are preparation plants. It's not under the resulting from provision of subsection C. I would draw your attention to the Fourth Circuit Hermann mining case where the rail cars were being loaded with coal. Now the court said that was a preparation facility because subsection I defines preparation as including loading. Are you telling me that when Congress used subsection lands and subsection C that they only were talking about lands associated with milling and preparation but not lands associated with extraction? Is that your answer? No. Congress was talking about extraction, milling, and preparation. Congress did put those three things in subsection C. What I'm saying is if it is not preparation, if it's not milling, if it is not extraction, then MSHA does not have jurisdiction. My point is if there is land that results from extraction, like some sort of retention pond or something of that nature, that it's not where extraction occurs, is it your contention that that is a mine under C or that it's not a mine under C? If it is a preparation plant, it is a mine. If it is not, then MSHA does not have jurisdiction because EPA does regulate these. Can you answer my question yes or no? Is a pond that is created as a result of extraction that is not a preparation plant or not a milling facility, is that a mine under subsection C? Yes or no? No, that is not a mine. Okay, I have your answer. Does anybody else have any questions? I just have one question. I understand because of budget precedent, it would have been somewhat futile to make this argument in this court, but you have an opportunity to preserve it if you file a cert. Do you believe that a petition by one executive agency, the Labor Department, against another executive agency, the Federal Mine Safety and Health Review Commission, is non-justiciable because it is an intra-branch dispute? It could potentially be, and I'm aware that then Judge Brett Kavanaugh wrote a concurring opinion precisely on that point, and I believe Judge Rao has written an opinion on that point as well. So I would say that it does seem odd that the review commission is on one side of the V and MSHA is on the other side of the V. But I think the answer is also that Congress chose to have this split enforcement mechanism. There are very few split enforcement schemes. OSHA is one of them because there is the OSHA Review Commission. I get that. I'm surprised you don't want to preserve an argument that that's unconstitutional for your cert petition. We have, and we do. You think it's unconstitutional? We do think that it's unconstitutional. Okay, I have your answer. Thank you. Is that present? I mean, it's not in your briefing. Well, I mean, it's preserved in the sense that, you know, if the court thinks that is a dispositive thing, then, you know, that would be preserved. I don't understand how you preserve something that you don't agree. That can be decided by our betters another day. Any other questions? I just have one question. I guess there's a whole line of argument that the provision we're looking at can't mean things that are not physical locations because there are other parts of the mining statute that very clearly from their context are talking about a physical location, addresses, things of that nature, registration. And the government's response is that the doctrine of reading a term consistently throughout a statute is really just a presumption that it's defeasible. And we have to look at it. It doesn't need to be applied rigidly. And so it's perfectly okay to look at the meaning of a mind in this section as not necessarily applying only to physical locations, even though in other parts of the statute, it is a physical location. I'd like to understand your response to that, because it seems to me that one reason perhaps we have this kind of inconsistent use of the word mine is that in some parts of the statute, Congress wanted to address physical locations, and there's no other thing to call it but mine. So then it becomes inconsistent with their definition of mine in this section. But I'm interested in your response to that. So I'll maybe say that location remains central, and I think all three members of this panel have recognized that. But the activity is confirmatory, because if you step on Casey Transport's repair shop, you'll see straight away that no extraction, milling, or preparation takes place at that facility. So just by some mine inspector, virtue of the fact that the mine inspector visited this facility and immediately saw none of those three things listed in the statute are occurring there, that should have been the dispositive clue that the mine inspector did not have jurisdiction to inspect at that location. So location, everything is tied to location. This is a different question than the one that I asked, which is I'm just looking at the argument that it's a matter of statutory interpretation. We're supposed to construe the word mine consistently throughout this statute, and there are other parts of the statute where contextually, clearly, it means a physical location. But in this provision, it seems contextually that it doesn't, because it talks about tools, equipment, things of that nature. And the government says, that's just a presumption, it's defeasible, we can just look at this in context, and it doesn't need to be rigid. And I want to know if you have a response to that. So our response is that that renders those other provisions surplusage or unworkable, which is true, because physical location is what everything else in the Mine Act talks about. So if the definition section is interpreted to cover non-location things, then that makes the rest of the act unworkable and surplusage. That would be the argument in response to that. Your Honor, I just wanted to put a pin, if you'll allow me, Judge Wilkins, to Judge Walker's point about the non-justiciability because of the two agencies being on different side of the fee. If the court determines that this issue is non-justiciable, we win, because that means the only option available for this court is to affirm the commission's decision. But you haven't briefed it. It's forfeited. Yes, and if you want supplemental briefs, we would be glad. Why should we give you that chance? You should have put in your brief. I was simply answering the question, and the answer to the question is, if that is a dispositive question in this panel's mind, then at the very least, we should be able to answer that question. I was merely answering the question. I just don't think that's the way it works. You get to make your arguments, and if you don't make an argument that you would have won on, you forfeited it. Unless the court mentions it, but if the court does not mention it, we, I think, have a strong case on the arguments that we have made. Your position is that if we reach that argument, and we agree that it's non-justiciable, then we dismiss the case, and then whatever the last decision that was rendered is the one that is binding. That was a decision in your favor. Is that what you're— Yes, so that is the commission's decision, yes, and if the court answers that question, we won't be the aggrieved party. It would be up to the secretary to file a cert petition to get that question before the court, so it's not a question of forfeiture. It's a question of if the court reaches that question, the court is free to do so, but if it does, then the commission's decision is simply affirmed because then this court lacks jurisdiction to decide it, and then it's up to the secretary to take it upstairs. I understand. Thank you. Thank you. Your Honor, I think we have covered everything. The court should reject the secretary's interpretation and affirm the commission's decision vacating MSHA's two citations for warrant of jurisdiction. Thank you. All right. Ms. Maltz, you were out of time, but we'll give you three minutes on rebuttal. Thank you, Your Honor. I'd like to address Judge Pan's point about one of the secretary's concerns with KC Transport's proposed interpretation. The operator could just move equipment across an arbitrary line in order to avoid inspection. That's purpose-defeating in terms of the Mine Act, and that's what KC Transport did in this case. KC Transport had a facility adjacent to the road, and then after MSHA sighted that facility, KC Transport moved its facility 1,000 feet from the road in an effort to avoid MSHA inspection. So, you know, insofar as an interpretation would require facilities, et cetera, to be—or equipment, I should say, movables, et cetera—to be located in a particular place, operators could avoid MSHA enforcement by running across a line. I'll very briefly speak—the court referred to Buffalo Creek and to Congress's purpose in writing Subsection C the way that it did. In Buffalo Creek in 1972, an impoundment dam burst and killed 125 people. Those are 125 real lives, not some hypothetical hammer in someone's living room. And I do understand the court has a probe definition, but this case deals with the facts here. It didn't have to deal with extraction, milling, or repairing. It was an impoundment dam related to a coal preparation plant, I believe, but it wasn't located at the coal preparation plant. So, you know, Congress specifically referred to that—you know, that is why Congress gave MSHA the authority to inspect impoundment dams, tailing ponds, equipment, facilities used in mining, even when they're not at a preparation plant. So, I don't quite understand KC Transport's argument about the EPA and the Department of Transportation, you know, covering these areas in the absence of MSHA. MSHA is a statute that was created to keep miners safe, and the EPA doesn't, you know, enforce miner safety law, nor does the Department of Transportation. I'm sure it enforces some safety law, but not miner safety law, and it doesn't make sense to have mining facilities, mining equipment, not regulated by an agency whose role is to ensure miner safety. I have a fact question. Judge Wilkins had asked your opposing counsel about a pond that is resulting from the work of extracting, and I just don't know enough about coal mining to know, could that pond be away from the extraction site? Yes, I believe that that pond could be away from the extraction site. Things can be ferried over to the pond. And also, you know, I think we've made this point in one of the briefs. The boundaries of the extraction site do shift, you know, mining often follows the natural thread of the mineral, and so an extraction site might end up, you know, there might be a pond created that's immediately adjacent to an extraction site, which later is no longer adjacent to that extraction site, because extraction has moved, you know, in a different direction. I think I'm over time, and I've made the points that I'd like to make. If there aren't other questions, I'm happy to conclude and sit down. All right. Thank you, counsel. Thank you to both counsel and Casey's submitted.
judges: Wilkins; Walker; Pan